# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-24-00751-CV

J. S., Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
NO. 22-2986, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

J.S. ("Mother") appeals from the trial court's decree terminating her parental rights to her daughters S.P. and T.P.[1] *See* Tex. Fam. Code §§ 161.001, .004. Following a bench trial, the court found by clear and convincing evidence that the requirements for terminating her parental rights under sections 161.001 and 161.004 were met. *See id.* § 161.001(b)(1)(D), (E), (F), (N), (b)(2), .004. In three issues on appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the statutory grounds for termination. We will modify the trial court's termination decree to correct a clerical error and affirm the decree as modified.

---

[1] For the children's privacy, we will refer to them by their initials and to their family members by their relationships to the children. *See* Tex. R. App. P. 9.8. The parental rights of the children's father ("Father") were also terminated, but he has not appealed.

## BACKGROUND

After becoming romantically involved, Mother and Father had their first child, S.P., in December 2017. A few weeks after S.P.'s birth, the Department obtained emergency possession of S.P. after concerns about admitted drug use by both Mother and Father, physical and sexual assaults against Mother, and sexual abuse against S.P. After removal, S.P. was placed in a foster home before being transferred to the home of Foster Parents a few months later. T.P. was born in January 2019. A few days later, the Department obtained emergency possession of T.P., and T.P. was placed with Foster Parents as well. After an unsuccessful return and monitor in July 2019, the Department filed petitions to terminate the parents' rights or to be named managing conservators of T.P. and S.P. The Department was named as temporary managing conservator for both children.

A jury trial was conducted in Travis County in January 2020. Following the trial, the jury found that there were statutory grounds authorizing termination of Mother's and Father's rights to S.P. and T.P. Regarding S.P., the jury determined that Mother and Father knowingly placed or allowed her to remain in conditions or surroundings that endangered her physical or emotional well-being, engaged in conduct or knowingly placed her with persons who engaged in conduct that endangered her physical or emotional well-being, and failed to comply with the provisions of a court order that established the actions necessary for Mother and Father to obtain the return of S.P. Concerning T.P., the jury made the same two endangerment findings for Father and determined that Mother and Father had failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of T.P. However, the jury also determined that it was not in the best interest of S.P. or T.P. for Mother's or Father's rights to be terminated.

The Travis County trial court issued an order on February 25, 2020, naming Foster Parents and the Department as managing conservators of S.P. and T.P. and naming Mother as possessory conservator. The court further ordered that visitation between Mother and the children occur as agreed to by the parties and that visitation occur once a week for two hours at the Department's office or in an area supervised by a Department employee. The order required Mother to confirm the visits with the Department caseworker and specified that the failure to confirm would result in the cancellation of the visit. The order also directed that Father should not have visits with the children. Under the trial court's order, Mother was required to pay child support in the amount of $255.72 per month.

In April 2022, the Department filed a motion to modify the final order alleging that there had been a material and substantial change since the final order, requesting to be removed as joint managing conservator, and asking for Foster Parents to be named as managing conservators. The trial court transferred the case to Hays County in December 2022 because Foster Parents and the children had moved there. After a permanency hearing, a trial court in Hays County ordered that all visits with the biological parents stop in June 2023. In January 2024, the Department filed an amended petition to modify the prior order asserting that there had been a material and substantial change, seeking termination of Mother's parental rights, and asking the trial court to consider the evidence from the prior proceeding.

In October 2024, the court conducted a bench trial. During the trial, the following witnesses testified: the current caseworker, the Court Appointed Special Advocate ("CASA") volunteer, Father, Mother, Foster Mother, and the CASA supervisor. Additionally, a log of Mother's visits with the children from July 2019 to June 2023 and a log of her child-support payments were admitted into evidence as well as the following documents from the prior case in

3

Travis County: the trial transcript, the original petitions concerning S.P. and T.P., the affidavits in support of the emergency removal of S.P. and T.P., the jury charge, the final order, and photos of the children during a virtual visit with Mother. During the trial, the witnesses testified regarding the best interest of the children and regarding the following three topics relevant to this appeal: visitations by Mother with the children, child-support payments by Mother, and evidence from the prior trial.

**Visitations**

At trial, the Department caseworker testified that she discussed with Mother the importance of her visits with the children, that Mother seemed to understand, that Mother was required to confirm visits 24 hours beforehand, and that Mother would sometimes fail to confirm a visit or fail to show after confirming.

The caseworker also discussed Mother's compliance for the years after the final order in the prior case. Specifically, the caseworker stated that for 2020 Mother had 44 visits scheduled and attended 28 of them. The exhibit containing the log of visits for that year showed that Mother attended a little over 75% of the scheduled visits and that she cancelled or failed to confirm the other visits.[2] Regarding 2021, the caseworker related that Mother had 56 visits scheduled and attended 28 of them. The visitation log showed that Mother attended 68% of the

---

[2] The log for 2020 documented that there were 34 possible visits after the final order in the prior case, that Mother attended 25 of those visits, that one visit was cancelled for reasons unrelated to Mother, that no visit occurred on 3 occasions because Mother did not confirm the visit the day before, that no visit occurred on 3 occasions because Mother cancelled, and that no virtual visit occurred on 2 occasions because Mother missed the call.

4

potential visits and that she failed to confirm, cancelled, or did not show up for the other visits.[3] The log noted that Mother did not show up for 3 of the visits despite confirming.

For 2022, the caseworker stated that there were 53 scheduled visits and that Mother attended 11 of them. The log for that year showed that Mother attended approximately 28% of the possible visits and that for the missed visits, she did not show up despite confirming, cancelled, or failed to confirm those visits.[4] The log also documented that Mother cancelled or failed to confirm every visit scheduled during the last 2 ½ months of the year and that T.P. did not want to participate in the 4 visits leading up to that block of missed visits. When discussing visits for 2023, the caseworker related that there were 24 visits scheduled and that Mother attended 7. The log revealed that Mother attended 41% of the possible visits and cancelled, failed to confirm, or was a "no show" despite confirming for the other visits.[5] Regarding one of the scheduled visits where Mother was a no show, the log reflected that T.P. did not want to go to that visit and that S.P. was confused about why Mother did not want to see her. The log also

---

[3] For 2021, the log showed that there were 52 possible visits for that year, that 2 of those were cancelled by the Department due to bad weather, that 1 of the Foster Parents cancelled 3 visits, that 3 visits were cancelled due to work conflicts or jury service for individuals other than Mother, and that Mother attended 30 visits, was a "no show" for 3 of the possible visits, failed to confirm 1 possible visit beforehand, and cancelled 10 possible visits.

[4] The log revealed that there were 51 possible visits for 2022; that 2 visits did not occur without any explanation why; that 1 of the Foster Parents cancelled 3 times; that the Department cancelled 4 times due to holidays, work conflicts, or an administrative error; and that Mother attended 11 visits, was a no show to 4 visits, did not confirm 18 visits, and cancelled 9 scheduled visits.

[5] Regarding 2023, the log documented that there were 24 possible visits before the trial court discontinued the visits, that 1 of the Foster Parents cancelled 2 of the visits due to a work conflict and S.P.'s being sick, that the Department cancelled 1 visit due to building-related issues, that 4 other visits did not occur but provided no explanation why, and that Mother attended 7 of the visits, cancelled 7 visits, failed to confirm 2 of the possible visits, and was a "no show" for 1 possible visit.

documented that Mother either cancelled or was a no show for the last 5 visits before the trial court stopped the visits.

When discussing the frequency of the visits, the caseworker stated that the percentage of scheduled visits that Mother attended decreased with time and that there had been a substantial change in Mother's attendance. In her testimony, the caseworker explained that it was harmful for children to expect to have a visit with a parent and then have the parent fail to show up. Regarding S.P., the caseworker stated that she was very upset when Mother did not show up and believed Mother "doesn't want to see me." Concerning T.P., the caseworker testified that she refused to attend the visits as time went on. Further, the caseworker recalled that if Mother did not show up for a visit, the children would fight with each other and that T.P. would act out. Additionally, the caseworker explained that the Department asked for the visits to stop because of Mother's inconsistency and for the sake of the children's well-being.

The CASA volunteer testified that Mother's missed visits were concerning and caused the children to feel disappointed and rejected. The CASA supervisor explained that Mother did not reach out to discuss trying to get her visitation rights back and did not show up for a hearing about reinstating those rights. The CASA supervisor discussed how Mother had a "massive fall-off in visitation," and he related that there was a significant negative change in Mother's attendance at the scheduled visits from the time of the final order in the previous case to when the trial court stopped the visits. He also believed that the decreased visits could have had an impact on the children.

Foster Mother testified that T.P. and S.P. were apprehensive on visit days and often said that they did not want to go. Further, Foster Mother related that S.P. would have nightmares after the visits and that T.P. would throw a fit, scream, and sometimes hit S.P.

6

Moreover, Foster Mother recalled that T.P. and S.P. would be confused when Mother did not show up for a visit and would be unable to regulate their emotions for the rest of the day.

In his testimony, Father stated that Mother's visits dropped so much in 2022 and 2023 because the Department cancelled the visits and because Mother did not have reliable transportation. Although Father acknowledged that he was not supposed to be present during the visits, he admitted that he drove Mother to 25 of her visits.

While testifying, Mother agreed that she had a "big drop" in her visits in 2022 and 2023, had cancelled multiple visits, would not show up after confirming, and had cancelled without confirming for 2 months in a row in 2022, but she said that she "had vehicle problems and . . . was working at that time." Mother acknowledged that the number of visits she attended toward the end was a change from the number of scheduled visits she previously attended. Additionally, Mother testified that the Department would cancel the visits if she was only fifteen minutes late and that the Department and Foster Parents cancelled visits too. Mother agreed that not showing up to the scheduled visits could have negatively affected her daughters. Mother also testified that when the visits were virtual, Foster Parents would interfere with the visits by interrupting to give the children toys or turning on the television.

**Child Support**

The child-support log showed that Mother owed $255.72 per month as set out in the prior order and that Mother made no payments from July 2020 to May 1, 2022. The log also documented that two collections were made on May 31, 2022, and credited to the outstanding balance, resulting in a reduction of the amount owed from $6,150.06 to $255.72. Further, the log reflected that from June 1, 2022, to March 1, 2023, Mother made no monthly payments. Three

7

collections were credited to the amount owed in March 2023 and April 2023, resulting in a reduction of the amount owed from $3,126.18 to $255.72. Finally, the log showed that Mother made no payments from May 2023 to October 2023 and that Mother owed $1,802.83.

The Department caseworker stated that Mother's child-support payments had not been consistent. The CASA supervisor testified that the child-support payments were made through income tax return garnishments, that paying a child-support bill once a year was not consistent with the monthly obligation imposed in the prior case, that the garnishments did not fulfill the debt owed, and that there did not seem to be "any attempt to support the children." Further, he explained that there had been a substantial change regarding the payments because the amount in arrears had increased.

Mother agreed that she had not been sending any child-support payments despite being ordered to do so. Further, Mother acknowledged that the money credited to her child-support obligation was from when the Attorney General garnished her income tax returns and that she had not personally made any payments; however, she explained that the prior tax garnishments nearly satisfied her obligation each time they were applied and that her next tax return should similarly cover the amount owed. Further, Mother related that she owns a cleaning business and that she had been developing the business for four years. However, Mother testified that she was not able to get a different job because she had to take care of her youngest daughter who was not a subject of this case. Additionally, Mother clarified that there had been no change in how she paid child support from the time of the prior order in February 2020 to the time of the trial in this case.

**Prior Case and Evidence of Endangerment**

In addition to evidence regarding events occurring after the final order in the prior case, evidence regarding the allegations in the prior case was also presented through the transcript of the prior trial and other exhibits and through testimony in the current case. According to the evidence from the first trial, Mother took S.P. for a scheduled checkup on January 18, 2018.[6] After nurses noticed bruising on Mother's face, Mother reported an alleged assault on January 6, 2018, and was told by the evaluating doctor that the doctor would have to contact the Department regarding what she had reported to the doctor. After learning that a report would be made to the Department, Mother decided to talk with police about an incident that had occurred on January 6, 2018, which was twelve days before the doctor's visit.

Later that day on January 18, 2018, Mother went to the restaurant where Father worked, noticed a police officer, and asked to talk to the officer. During her conversation with the officer, Mother reported that weeks earlier on January 6 one of the restaurant's employees had forced her to ingest methamphetamine and assaulted her in her truck in the presence of S.P., who was less than a month old at the time. Mother accused the restaurant employee of hitting her, causing her to lose consciousness. According to her report to the officer, when Mother regained consciousness, she noticed that there was semen on her baby's [S.P.'s] face. Additionally, Mother alleged that the employee forced her to carve Father's first name on her forehead with a razor that was in the truck. Mother explained that the employee threatened to kill her if she told anyone, and Mother tried to hide the injuries by putting makeup on her

---

[6] In the prior trial, Mother testified that she took S.P. to the doctor for a scheduled checkup on January 8, 2018, after noticing a discharge coming out of S.P.'s vagina; however, Mother also admitted that she did not remember what day she took S.P. to the doctor, and testimony from other witnesses indicated that the appointment was on January 18, 2018. During the more recent trial, Mother agreed that she took S.P. to the doctor on January 18, 2018.

forehead and using her hair to cover the wounds. Father told the officer that he saw the semen on S.P.'s face and wiped it off. Mother testified that a few days after the assault she noticed a white discharge on S.P.'s vagina, and Mother wondered if the accused employee had inserted some of the semen into S.P.'s vagina.

After the Department received a referral concerning the case, an investigator went to Mother and Father's home to discuss the incident with them. While talking with the investigator, Mother admitted to using methamphetamine while she was pregnant with S.P., and Father explained that Mother became addicted to drugs. But Mother stated that she had stopped using drugs. During this visit, Father tested positive for methamphetamine and amphetamines. The investigator directed Mother and Father to take S.P. to the hospital due to the possibility that S.P. had been sexually assaulted, but they failed to take her. Mother later reported to the investigator that the assailant was a different restaurant employee from the one she previously falsely accused.

In March 2018, both Mother and Father tested positive for drugs, and Father had four or five additional positive drug tests throughout the case. Mother and Father both missed multiple scheduled drug tests, and Mother had two diluted drug test results. S.P. and T.P. were returned to Mother and Father's care in July 2019, but they were removed a few days later after Father tested positive for drugs. One of the caseworkers testified that when S.P. was returned to the care of Foster Parents following the failed return and monitor in July 2019, Foster Parents noticed that S.P. had a swollen vagina that would have been apparent to anyone who had changed her diaper, and Foster Parents took S.P. to the doctor after noticing the swelling. The caseworker described Mother and Father's decision not to seek medical treatment for S.P. for this incident, as well as after the alleged assault in 2018, as endangering to S.P.

10

In February 2019, Mother claimed that the assailant from the January 2018 incident was actually her ex-husband and not the employee at the restaurant that she previously identified. According to Mother, she did not name her ex-husband as the true assailant earlier because she was worried about how Father would react upon learning the truth. Additionally, Mother related that she did not inform the police because she was scared that her ex-husband would hurt S.P. or her. Mother admitted that she lied to the police about the identity of the assailant and location of the assault and that she chose to blame a random restaurant employee when reporting the assault.

In the current case, Father confirmed much of the testimony from the prior trial. Father also admitted that he was still involved with Mother and drove her to many of her visits with the children. Mother also confirmed much of the testimony from the prior case, including her having made a false report to the police. She testified that she now has another child with Father that they were raising together, that she had been taking care of her other child, that she had been working on developing and expanding her cleaning business for years, that she now has contracts for her business, and that she has lived in her home for a year and a half.

After considering the evidence presented at trial, the trial court explained that it did not find Mother or Father to be credible and then determined that there had been a material and substantial change since the date that the prior order denying termination had been rendered, that the Department properly requested that the trial court consider evidence from the prior trial, that Mother committed one of the prohibited statutory grounds for termination before the prior order, and that Mother had committed another statutory ground for termination after the prior order. Regarding the statutory grounds, the trial court found that Mother had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or

11

emotional well-being, engaged in conduct or knowingly placed them with people who engaged in conduct that endangered their physical or emotional well-being, failed to support them in accordance with her ability, and constructively abandoned them. The trial court also determined that termination of Mother's rights was in the children's best interest. Accordingly, the trial court rendered its decree terminating Mother's rights.

Mother appeals the trial court's termination decree.

## APPLICABLE LAW AND STANDARD OF REVIEW

On appeal, Mother challenges the legal and factual sufficiency of the trial court's findings supporting termination. To terminate parental rights, the Department must prove both (1) one of the statutory-predicate grounds and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2). The Department must prove both elements by clear and convincing evidence. *See id.* § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

The Family Code provides another vehicle for terminating parental rights when there has already been a termination trial concerning the same children. *See* Tex. Fam. Code § 161.004. If a trial court previously rendered an order denying termination of a parent's rights, a trial court may later terminate the parent's rights if the following requirements are met:

> (1) the petition under this section is filed after the date the order denying termination was rendered;
>
> (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

12

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4) termination is in the best interest of the child.

*Id.* § 161.004(a). At a subsequent termination hearing, "the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child." *Id.* § 161.004(b). As in other contexts, the existence of a "material and substantial change" is a "threshold" inquiry about whether the moving party has met a burden of showing that the case can proceed. *See Hamilton v. Maestas*, No. 07-18-00320-CV, 2020 WL 1696807, at *3 (Tex. App.—Amarillo Apr. 7, 2020, no pet.) (mem. op.); *In re T.K.D-H.*, 439 S.W.3d 473, 482 (Tex. App.—San Antonio 2014, no pet.).

Reviewing the legal sufficiency of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack and considering undisputed contrary evidence to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). The factfinder has a right to disbelieve any witness's testimony. *See S.C. v.*

13

*Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *15 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). And it is the factfinder's role to draw any reasonable inferences from the evidence that it chooses and to choose between conflicting reasonable inferences. *See In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022); *B.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00118-CV, 2020 WL 5100641, at *17 (Tex. App.—Austin Aug. 28, 2020, pet. denied) (mem. op.).

## DISCUSSION

In her first issue on appeal, Mother contends that the trial court erred by admitting evidence from the prior trial because the evidence was legally and factually insufficient to show that there had been a material and substantial change of circumstances. In her second and third issues, Mother argues that the evidence was legally and factually insufficient to terminate her rights for failure to pay child support and for constructive abandonment.

### Material and Substantial Change

When presenting her first issue on appeal, Mother acknowledges that section 161.004 of the Family Code allows a trial court to consider events predating an order denying termination when the requirements of that statute are met. *See In re N.R.T.*, 338 S.W.3d 667, 678-80 (Tex. App.—Amarillo 2011, no pet.) (explaining that res judicata did not bar consideration of evidence from before prior order denied termination where requirements of section 161.004 were met). However, Mother contends that the Department failed to establish that there had been a material and substantial change as required by section 161.004. *See* Tex. Fam. Code § 161.004(a)(2). As support, Mother points to cases from our sister courts of appeals

14

that have found material and substantial changes and argues that the circumstances present in those cases differ from those present here.[7]

Further, Mother highlights that this Court has determined that the passage of time cannot provide a basis for determining that a material and substantial change has occurred and suggests that is what occurred in this case. *See Zeifman v. Michels*, 212 S.W.3d 582, 594-95 (Tex. App.—Austin 2006, pet. denied) (child's change in age alone was insufficient to establish material and substantial change in conservatorship context). Additionally, Mother emphasizes her testimony concerning her current employment, raising her other child, and living in her house for a year and a half, and she argues that there is no evidence of any instability in her home following the prior case. Mother points out that she was not ordered to complete family services following the prior case and, therefore, did not fail to comply with any required services. Moreover, Mother contends that the lack of a service plan as part of a reunification plan distinguishes this case from cases that have considered reductions in visitation when deciding if there had been a material and substantial change.

Although Mother acknowledges that she was not consistent with her visits after the prior case, she asserts that she has never been consistent when it comes to attending the visits

---

[7] *See, e.g.*, *In re C.A.C.*, No. 14-12-00396-CV, 2012 WL 4465234, at *9 (Tex. App.—Houston [14th Dist.] Sept. 27. 2012, no pet.) (mem. op.) (parent sent to prison); *In re A.S.R.*, No. 14-24-00444-CV, 2024 WL 4850324, at *3 (Tex. App.—Houston [14th Dist.] Nov. 21, 2024, pet. denied) (mem. op.) (parent's rights to different child were terminated); *In re J.R.*, No. 07-12-00003-CV, 2012 WL 1605738, at *5 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (parent did not maintain contact with Department, continued instability caused new effects, and children no longer wanted reunification); *In re D.A.*, No. 12-22-00183-CV, 2022 WL 4793804, at *3 (Tex. App.—Tyler Sept. 30, 2022, no pet.) (mem. op.) (grandparent removed herself as placement option); *In re A.M.E.*, No. 01-21-00214-CV, 2021 WL 4533262, at *4 (Tex. App.—Houston [1st Dist.] Oct. 5, 2021, no pet.) (mem. op.) (parent's failure to follow through with DNA testing and communicate with Department and increase in need for child to be adopted); *In re A.E.*, No. 13-14-00124-CV, 2014 WL 4161587, at *6 (Tex. App.—Corpus Christi-Edinburgh Aug. 21, 2014, no pet.) (mem. op.) (parent's later drug use).

with S.P. and T.P. both before and after the prior order. Additionally, Mother argues that the terms of the prior order were vague and did not specify what day the visits should occur or where they should be held. While acknowledging that the CASA volunteer testified that the missed visits were affecting the children, Mother contends that the basis for that testimony was information the CASA volunteer learned from Foster Parents whom Mother suggests wanted the termination to happen and whom Mother described as interfering with her earlier visits. Further, Mother argues that the terms "material" and "substantial," taken together, must refer to a change that is "truly large and important." Based on that characterization, she insists that there was no material and substantial change because she merely continued her previous behavior or mildly changed it.

"[T]here are no definite guidelines as to what constitutes a 'material and substantial change in circumstances' to terminate parental rights under section 161.004." *In re F.M.E.A.F.*, 572 S.W.3d 716, 725 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (quoting *In re A.L.H.*, 515 S.W.3d 60, 89 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)). Determinations regarding material and substantial changes are "fact-specific and must be made according to the circumstances as they arise." *In re A.L.H.*, 515 S.W.3d at 80. "A material and substantial change in circumstances may be established by either direct or circumstantial evidence." *In re H.M.O.L.*, Nos. 01-17-00775—00776-CV, 2018 WL 1659981, at *11 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.).

As an initial matter, we note that at least one of our sister courts of appeals has addressed the issue of whether failures to visit can constitute a material and substantial change under section 161.004 of the Family Code. *See In re M.J.W.*, No. 14-16-00276-CV, 2016 WL 4206046, at *8 (Tex. App.—Houston [14th Dist.] Aug. 9, 2016, pet. denied) (mem.

op.). Although Mother correctly points out that her visitation schedule was not part of a service plan as it was in the case from our sister court, *see id.*, we do not believe that the lack of a service plan means a reduction in visits or failures to visit cannot be considered in a material-and-substantial-change analysis, particularly where, as here, there was an order setting out a visitation schedule for Mother. Although Mother asserts on appeal that the final order was too vague and did not list the day or the location for the visits, Mother did not testify at trial that her failures to attend or confirm visits were due to a lack of understanding regarding when or where the visits were supposed to happen. Further, the Department caseworker testified that she discussed with Mother how important the visits were and the need to confirm the visits beforehand and that Mother understood those obligations.

Moreover, although Mother contends that the evidence showed that her visits were consistently inconsistent or became only slightly more sporadic over time, the trial court was tasked with evaluating if there was a decline in attendance and how significant the decline was. In making that determination, the trial court was aided by the testimony presented at trial and the visit log.

The Department log showed that for the portion of the year 2020 following the rendition of the prior order, Mother attended over 75% of the possible visits. The log was consistent with the testimony of the caseworker who testified regarding the entirety of year 2020. For year 2021, unlike for the previous year, the log also documented that Mother confirmed but failed to show for three visits. Moreover, the log chronicled that Mother attended approximately 68% of the possible visits after removing the visits that did not occur for reasons unrelated to her. The log entries were consistent with the testimony by the caseworker.

17

Concerning year 2022, Mother attended approximately 28% of the visits that she could have after removing visits that were cancelled for reasons unrelated to Mother and that Mother failed to appear despite confirming four times. The log entries were consistent with the testimony by the caseworker. Moreover, the log showed that Mother missed every possible visit during the last two and a half months of that year. *See id.* (emphasizing in "material and substantial change" analysis that Mother had not visited child "in over two months"). Regarding 2023, the log detailed that Mother attended 41% of the visits that she could have after removing the visits that were cancelled for reasons unrelated to Mother or for which no explanation was given. The log entries were consistent with the testimony by the caseworker. Further, the log documented that Mother failed to show for one visit despite confirming beforehand and either cancelled or failed to appear for the last five visits before the trial court stopped the visits. *See In re J.R.*, No. 07-12-00003-CV, 2012 WL 1605738, at *5 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (noting in analysis regarding material and substantial change that visits were sporadic).

Both the caseworker and the CASA supervisor testified that Mother's visits had decreased since the order from the prior case and described the decrease as "substantial" or "massive." Mother also agreed that there had been a significant drop in her visits for years 2022 and 2023, particularly for the months-long block of no visits in both years, but she stated that she had car issues and was working. Father acknowledged Mother's drop in visits for years 2022 and 2023 but said those were due to the Department's cancelling the visits or Mother's lack of reliable transportation. As set out above, the trial court explained that it did not find Mother or Father to be credible. *See In re A.B.*, 437 S.W.3d at 503.

In addition to documenting missed visits, the log also documented the effect that the missed visits had on the children. According to the log for 2022, T.P. told the caseworker that she no longer wanted to attend the visits for the four visits before the large, missed block. Similarly for 2023, the log chronicled that T.P. stated that she did not want to participate in the visits and that S.P. expressed confusion as to why Mother did not want to see her.

Multiple witnesses testified how the visitation requirement and the missed visits started having an effect on S.P. and T.P. as the case went on. For example, Foster Mother testified that the children became apprehensive on visitation days and did not want to go, that S.P. would have nightmares after the visits, that T.P. would misbehave after the visits, and that they would be confused and unable to regulate their emotions when Mother missed a visit. As set out above, following the first year, Mother started not showing up at all to visits despite confirming them. Mother agreed that not showing up for visits could have negatively affected her daughters. The caseworker explained that it was harmful to children when parents do not show up for scheduled visits, that S.P. would become upset following missed visits and believed Mother did not want to see her, that T.P. would act out if Mother did not visit and stopped wanting to attend the visits, and that the children would fight with one another if Mother failed to show. Similarly, the CASA volunteer testified that Mother's missing visits made the children feel rejected. *See In re N.B.*, No. 12-22-00236-CV, 2022 WL 16843243, at *4 (Tex. App.—Tyler Nov. 9, 2022, pet. denied) (mem. op.) (considering in best-interest analysis that parent's "missed visits" caused child distress and that child's behavior "stabilized during the periods of no visitation"); *In re J.R.*, 2012 WL 1605738, at *5 (noting in material-and-substantial-change analysis that children's desires to be with parents had changed).

19

Although Mother argues on appeal that the foundation of much of this evidence was provided by Foster Parents who had an interest in the outcome of the proceeding, the trial court was free to decide what weight to give this evidence. *See In re A.B.*, 437 S.W.3d at 503. In evaluating this evidence, the trial court could have also considered Mother's admission that not showing up for visits could have negatively affected her children and the log entries showing that Mother started not showing up for confirmed visits after the first year. Additionally, the CASA supervisor testified that Mother did not show up for a hearing addressing her visitation rights. Moreover, given the evidence of a reduction in visits and the accompanying negative effects on the children and their desire to visit Mother, the trial court could have reasonably concluded that the evidence did not pertain to changes occurring simply due to the children's getting older. *Cf. Baker v. Peterson*, No. 10-02-01113-CV, 2004 WL 756622, at *3 (Tex. App.—Waco Apr. 7, 2004, no pet.) (mem. op.) (determining that evidence was sufficient to support finding of material and substantial change in conservatorship context where child got older and parent "poisoned" child's mind against other parent).

After applying the appropriate standards of review, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that there was a material and substantial change in circumstances in this case since the date that the prior order was rendered. *See* Tex. Fam. Code § 161.004(a)(2). When presenting this issue on appeal, Mother does not challenge the sufficiency of the other elements of section 161.004 needed to terminate a parent's rights. Accordingly, we conclude that the evidence was legally and factually sufficient to support termination of Mother rights under section 161.004. *See In re J.M.T.*, 652 S.W.3d 525, 531-32 (Tex. App.—San Antonio 2022, pet. denied) (determining that there was sufficient evidence to support substantial and material change and affirming termination under section

161.004 because appellant did not allege that evidence was insufficient to show that other requirements of section 161.004 had been met).

For these reasons, we overrule Mother's first issue on appeal.

**Failure to Support and Constructive Abandonment**

In her second issue on appeal, Mother contends that the evidence was legally and factually insufficient to terminate her parental rights for failure to pay child support under subsection 161.001(b)(1)(F) because the evidence did not establish that she had the ability to support S.P. and T.P. during the relevant time. *See* Tex. Fam. Code § 161.001(b)(1)(F). In her third issue, Mother argues that the evidence was legally and factually insufficient to establish that she constructively abandoned the children under subsection 161.001(b)(1)(N) because the evidence did not establish that the Department made reasonable efforts to return the children to her. *See id.* § 161.001(b)(1)(N).

In the prior issue, we determined that the evidence was legally and factually sufficient to support termination under section 161.004, and therefore, we need not address whether the evidence was legally and factually sufficient to support termination under the above two grounds listed in section 161.001. *See In re J.M.T.*, 652 S.W.3d at 532 n.2. Even assuming that section 161.004 did not provide an independent basis for termination, we would not need to address the sufficiency of the evidence pertaining to grounds (F) and (N). Although Mother argued that the evidence from the prior case could not be used as a basis for the endangerment findings because no material and substantial change had occurred, Mother has not otherwise challenged the sufficiency of the evidence pertaining to the (D) and (E) endangerment findings under subsection 161.001(b)(1). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Accordingly,

21

"[w]e are bound by the unchallenged endangerment findings." *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00336-CV, 2024 WL 4795260, at *2 n.3 (Tex. App.—Austin Nov. 15, 2024, pet. denied) (mem. op.). Because only one predicate violation under subsection 161.001(b)(1) is necessary to support a termination decree and because the endangerment grounds have not been challenged, we need not address Mother's second and third issues challenging the sufficiency of the evidence for termination under grounds (F) and (N). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re S.L.*, 421 S.W.3d 34, 37 (Tex. App.—Waco 2013, no pet.).

For these reasons, we overrule Mother's second and third issues on appeal.

**Modification**

Although Mother does not raise the issue on appeal, we note that there is an error in the trial court's termination decree that requires correction. The order terminating Mother's parental rights lists grounds (D), (E), (F), and (G). However, the language of the order before the reference to ground (G) discusses Mother's having constructively abandoned the children, which is the language used in ground (N), not (G). *See* Tex. Fam. Code § 161.001(b)(1)(G), (N). Consistently, at the end of the termination hearing, the trial court explained that it was terminating under (D), (E), (F), and (N) grounds and did not mention (G).

We have the authority to modify a judgment when we have the necessary information to do so. *See* Tex. R. App. P. 43.2(b); *In re M.D.*, 333 S.W.3d 600, 601 (Tex. App.—Dallas 2007, no pet.). Accordingly, we modify the decree of termination to reflect that Mother's parental rights were terminated on ground (N) and not (G).

22

**CONCLUSION**

Having modified the trial court's termination decree as set out above and having overruled Mother's three issues on appeal, we affirm the trial court's decree as modified.

_____

Karin Crump, Justice

Before Justices Kelly, Crump, and Ellis
  Dissenting Opinion by Justice Ellis

Modified and, as Modified, Affirmed

Filed:  May 14, 2025

23